UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

—————————————————————————

| | | |
|---|---|---|
| MAHMOUD SAYED-ALY; | : | |
| AKRAM ABDULLATIF; | : | |
| HESHAM SAYED, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | No. 5:15-cv-02485 |
| | : | |
| TOMMY GUN, INC., | : | |
| doing business as TARGETMASTER; | : | |
| THOMAS MILOWICKI, | : | |
| | : | |
| Defendants. | : | |

—————————————————————————

## MEMORANDUM OPINION AND ORDER

**Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, ECF No. 9 - Denied**

**Joseph F. Leeson, Jr.**                                                          **March 15, 2016**
**United States District Judge**

## I.        Introduction

On December 28, 2013, Plaintiffs Mahmoud Sayed-Aly, Akram Abdullatif, and Hesham

Sayed found themselves at an indoor firearm range and gun shop[1] owned by Defendant Tommy

Gun, Inc. Am. Compl. ¶ 8, ECF No. 8. After engaging in a session of target practice, Plaintiffs

planned to visit Tommy Gun's showroom to browse the items for sale and to purchase some

things from the store. Id. ¶ 10 & n.1. Before proceeding to the showroom, Plaintiffs entered a

restroom on the premises to wash their hands. Id. ¶ 9. While in the restroom, Plaintiffs, who

describe themselves as being of "Arabic/Middle Eastern" descent, were speaking to each other in

Arabic when a man, believed to be Defendant Thomas Milowicki, the owner of Tommy Gun,

approached them and "began yelling discriminatory and derogatory comments toward [them]

---

[1]        Plaintiffs' Amended Complaint does not concisely describe the type of business that Tommy Gun, Inc.
operates, but their original complaint alleged that the company operates an "indoor firearm range and gun shop,"
which is consistent with their present allegations. Compl. ¶ 4, ECF No. 1.

regarding their national origin, race, and ethnic characteristics." Id. ¶¶ 11-13. Milowicki

allegedly said to them, "you are probably middle eastern," and told them to "speak English or get

the f _ _ _ out" and to "get the f _ _ _ out and never come back." Id. ¶¶ 14-15. Milowicki then

ejected Plaintiffs from the premises, forcing them to abandon their plan to visit the showroom,

and continued to heckle them as he followed them out to the parking lot, calling them "Sand

N _ _ _ _ _ _" and "Mid-eastern pieces of s _ _ _" and telling them to "go pray to Allah."

Id. ¶¶ 16-17.

Plaintiffs then filed this suit, claiming that Milowicki and Tommy Gun violated the

Pennsylvania Human Relations Act ("PHRA") and 42 U.S.C. § 1981 by removing them from the

premises on the basis of some combination of their national origin, race, ancestry, ethnic

characteristics, and linguistic characteristics. See id. ¶¶ 20, 21-32. Defendants move to dismiss

the suit in its entirety, claiming that Plaintiffs have failed to state a claim for relief under either

theory. Because these allegations state a plausible claim for relief under both the PHRA and

§ 1981, Defendants' motion is denied.

## II.    Legal standard – Motion to dismiss for failure to state a claim

The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim

upon which relief can be granted. Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005)

(citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)). This Court

must "accept all factual allegations as true, construe the complaint in the light most favorable to

the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff

may be entitled to relief." See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)

(quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal

quotation marks omitted).

In <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), the Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555 (citing <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)). In <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), the Court subsequently laid out a two-part approach to reviewing a motion to dismiss under Rule 12(b)(6).

First, the Court observed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." <u>Id.</u> at 678. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive the motion; "instead, 'a complaint must allege facts suggestive of [the proscribed] conduct.'" <u>Id.</u>; <u>Phillips</u>, 515 F.3d at 233 (quoting <u>Twombly</u>, 550 U.S. at 563 n.8). While Rule 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," was "a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." <u>Iqbal</u>, 556 U.S. at 678-79 ("Rule 8 . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (citing <u>Twombly</u>, 550 U.S. at 555)); <u>see</u> Fed. R. Civ. P. 8(a)(2). For "without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests." <u>Phillips</u>, 515 F.3d 224, 232 (citing <u>Twombly</u>, 550 U.S. at 555 n.3).

Second, the Court emphasized, "only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience

and common sense." Iqbal, 556 U.S. at 678. Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. Phillips, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 555). This is because Rule 8(a)(2) "requires not merely a short and plain statement, but instead mandates a statement 'showing that the pleader is entitled to relief.'" See id., 515 F.3d at 234 (quoting Fed. R. Civ. P. 8(a)(2)). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "Detailed factual allegations" are not required, id. at 678 (quoting Twombly, 550 U.S. at 555), but a claim must be "nudged . . . across the line from conceivable to plausible," id. at 680 (quoting Twombly, 550 U.S. at 570).

"The plausibility standard is not akin to a 'probability requirement,'" but there must be "more than a sheer possibility that a defendant has acted unlawfully." Id. at 678 (quoting Twombly, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" Id. (quoting Twombly, 550 U.S. at 557)).

## III.    Plaintiffs have stated plausible claims for relief under the PHRA and § 1981.

Defendants attack the viability of Plaintiffs' two claims on a variety of grounds, none of which are meritorious. A discussion of each follows, organized under the headings of the two claims.

### A.    The PHRA

According to Defendants, the PHRA has no applicability here because the Act is "wholly devoid of any mention of discrimination within a retail/commercial setting" and instead only

"prohibits discrimination in employment and housing/real estate transactions" and "provides protections for persons who are handicapped."[2]

Defendants appear to have overlooked section 955(i)(1), which provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or any person being the owner, lessee, proprietor, manager, superintendent, agent or employe of any public accommodation, resort or amusement to . . . [r]efuse, withhold from, or deny to any person because of his race, color, sex, religious creed, ancestry, national origin or handicap or disability . . . any of the accommodations, advantages, facilities or privileges of such public accommodation, resort or amusement." 43 Pa. Stat. and Cons. Stat. Ann. § 955(i)(1) (West 2009). This provision is Pennsylvania's state-law analog to Title II of the Civil Rights Act of 1964, Levy v. Trent Motel Assocs., LP, No. 11-776, 2011 WL 3803647, at *7 (E.D. Pa. Aug. 26, 2011), the purpose of which was to "vindicate 'the deprivation of personal dignity that surely accompanies denials of equal access to public establishments,'" see Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 250 (1964) (quoting S. Rep. No. 88-872, at 16-17 (1964)).[3]

Accordingly, Pennsylvania courts have invoked section 955(i)(1) to reach discrimination in various places of public accommodation, including a bar that charged patrons different amounts depending upon their gender, see Commonwealth, Pa. Liquor Control Bd. v. Dobrinoff, 471 A.2d 941 (Pa. Commw. Ct. 1984), a bantam bowling league that barred youth bowlers from joining because of their race, see Commonwealth, Human Relations Comm'n v. Loyal Order of Moose, Lodge No. 107, 294 A.2d 594 (Pa. 1972), and a cemetery that refused to bury remains depending upon the race of the decedent, see Pa. Human Relations Comm'n v. Alto-Reste Park

---

[2]     Mem. Supp. Mot. Defs. 10, ECF No. 9.
[3]     See 42 U.S.C. § 2000a ("All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race, color, religion, or national origin.").

Cemetery Ass'n, 306 A.2d 881 (Pa. 1973). The PHRA supplies a lengthy list of the types of establishments that constitute a "public accommodation, resort or amusement." Included in the list are both "retail stores and establishments" and "shooting galleries"—both sides of Tommy Gun's combination firearm range and gun shop. See 43 Pa. Stat. and Cons. Stat. Ann. § 954(l); Alto-Reste, 306 A.2d at 886 (recognizing that the PHRA is to "be construed liberally" and that the definition of places of public accommodation "is broad and all inclusive"). Defendants' contention that the PHRA does not apply to the discrimination alleged is without merit.

**B.     Section 1981**

Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts," which "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981 (a)-(b). Accordingly, "[s]ection 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship." See Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006). Section 1981's protections apply to "all contracts," Rivers v. Roadway Express, Inc., 511 U.S. 298, 304 (1994), which undoubtedly includes the sale of goods or services at retail establishments. See Perry v. Command Performance, 913 F.2d 99 (3d Cir. 1990) (applying § 1981 to a claim that a beauty salon refused to serve a black customer); see also Garrett v. Tandy Corp., 295 F.3d 94, 99-101 (1st Cir. 2002) (surveying cases from around the circuits involving § 1981 claims in the context of retail stores, and distilling from them the requirement that "a retail customer must allege that he was actually denied the ability either to make, perform,

enforce, modify, or terminate a contract, or to enjoy the fruits of a contractual relationship, by reason of race-based animus").

"Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts." Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609 (1987) (citing Runyon v. McCrary, 427 U.S. 160, 168 (1976)); see Domino's Pizza, 546 U.S. at 474-75 (observing that the function of § 1981 is to protect the right to contract "without respect to race"). Defendants' first line of attack is that Plaintiffs do not allege discrimination on the basis of race.[4]

According to Defendants, "because the Plaintiffs . . . are, by their own admission, Middle Eastern, they are in fact members of the Caucasian (White) race," and from that premise, Defendants suggest that they have not stated plausible claims of racial discrimination.[5] That same argument was presented to the Supreme Court in 1987, and the Court rejected it. There, the defendants argued that the plaintiff, who was born in Iraq, was "a Caucasian and cannot allege the kind of discrimination § 1981 forbids." Al-Khazraji, 481 U.S. at 609. The Court had "little trouble" rejecting that argument, because at the time § 1981 became law, groups such as "Arabs, Englishmen, Germans," and other ethnic groups that may now, for some purposes, be grouped under the heading "Caucasian" were viewed as separate races. See id. at 612. The history of

---

[4]     Much of Defendants' brief is difficult to follow. They argue that "the reach of § 1981 does not extend to discrimination based upon national origin, ancestry, ethnic characteristics or linguistic characteristics," but then, one sentence later, quote the Court's observation in Al-Khazraji's that Congress intended to offer a remedy to those who are discriminated against "because of their ancestry or ethnic characteristics." See Mem. Supp. Mot. Dismiss 11. They then proceed argue at length that § 1981 does not protect against discrimination based solely on national origin, before "acknowledg[ing] and clearly accept[ing] that the Plaintiffs here have also included 'racial discrimination' within their § 1981 claim." See Mem. Supp. Mot. Dismiss 11-13. Whether Defendants intend to argue either of these points is therefore unclear, but each will be addressed.

[5]     See Mem. Supp. Mot. Dismiss 11. For support for this premise, Defendants cite to the "Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity," promulgated by the Office of Management and Budget for the purpose of "provid[ing] a common language for uniformity and comparability in the collection and use of data on race and ethnicity by Federal agencies," which provides that the racial category of "White" includes all persons "having origins in any of the original peoples of Europe, the Middle East, or North Africa." See Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed. Reg. 58,782, 58,788-89 (Oct. 30, 1997).

§ 1981 reveals that Congress adopted an expansive notion of race, intending for § 1981 to "protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." Id. at 613. "[A]t a minimum," § 1981 "reaches discrimination against an individual 'because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens,'" but even a "distinctive physiognomy is not essential to qualify for § 1981 protection." Id. at 613 (quoting Al-Khazraji v. Saint Francis Coll., 784 F.2d 505, 517 (3d Cir. 1986), aff'd 481 U.S. 604 (1987)). Accordingly, the Court observed that Al-Khazraji could have succeeded on a § 1981 claim simply by "prov[ing] he was subjected to intentional discrimination based on the fact that he was born an Arab." See id. Here, Plaintiffs have alleged that they are of "Arabic/Middle Eastern" descent and were discriminated against on that basis. Defendants' first argument, therefore, runs headlong into contrary Supreme Court precedent.[6] See Amini v. Oberlin Coll., 259 F.3d 493, 503 (6th Cir. 2001) (concluding that a plaintiff's allegations of "discrimination based on his 'Middle Eastern' race . . . clearly [fell] within the Supreme Court's expansive notion of 'race' for purposes of a § 1981 discrimination claim").

Defendants devote a substantial portion of their briefing to the argument that § 1981 does not reach discrimination based solely on national origin, and on that point, they are correct. See Al-Khazraji, 481 U.S. at 613 (observing that the Iraqi plaintiff could succeed under § 1981 as long as the discrimination he faced was not based "solely on the place or nation of his origin"); Bennun v. Rutgers State Univ., 941 F.2d 154, 172 (3d Cir. 1991) (recognizing that a claim founded solely on national origin "would not be sufficient for a § 1981 claim under Al-

---

[6]    See also El-Hallani v. Huntington Nat'l Bank, No. 13-CV-12983, 2014 WL 2217237, at *5 & n.5 (E.D. Mich. May 29, 2014), reversed on other grounds, 623 F. App'x 730 (6th Cir. 2015) (noting that the mere fact that a person could be identified as "white" pursuant to the racial categories defined by the Office of Management and Budget "does not mean they are not of Arab or Middle Eastern ethnicity or descent" and that any argument that such a classification precludes a § 1981 claim would be foreclosed by Al-Khazraji).

Khazraji"). But it is plain from Plaintiffs' allegations that they are not complaining solely of national origin discrimination. Plaintiffs allege that Milowicki approached them in the bathroom and proceeded to hurl a barrage of racially, ethnically, and religiously[7] charged epithets at them. Plaintiffs do not allege that Milowicki had any knowledge of their place of origin, and the Amended Complaint does not indicate where that place is. From these allegations, there is no reason to believe that their experience would have been different even if their place of origin was the United States; the only explanation is that it was immediately apparent to Milowicki that they were "genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens," and they were subjected to this treatment on that basis. That Milowicki allegedly said, "you are probably middle eastern" and called them "Mid-eastern pieces of s _ _ _" does not change the calculus. "[T]he line between discrimination based on 'ancestry or ethnic characteristics' and discrimination based on 'place or nation of . . . origin' is not a bright one," and "often the two are identical as a factual matter." Al-Khazraji, 481 U.S. at 614 (Brennan, J., concurring). As Al-Khazraji recognized, the debates over the Civil Rights Act of 1866 and the Voting Rights Act of 1870, both of which formed the source of § 1981, revealed that "Chinese," "Mexicans," "Germans" were viewed as separate races, and suggested that immigrant groups from various nations would be protected from discrimination. See id. at 612-13 (majority opinion). Under this conception of race, Plaintiffs' allegations, at the least, do not suggest that the Plaintiffs are complaining of "discrimination based on birthplace alone." See id. at 614; cf. Mulholland v. Classic Mgmt. Inc., No. CIV. A. 09-2525, 2010 WL 2470834, at *3-4 (E.D. Pa.

---

[7]      See generally Hassan v. City of New York, 804 F.3d 277, 303 (3d Cir. 2015) (recognizing that "the conflation of Arab and Muslim identity was deeply entrenched within the courts during the Naturalization Era" (quoting Khaled A. Beydoun, Between Muslim and White: The Legal Construction of Arab American Identity, 69 N.Y.U. Ann. Surv. Am. L. 29, 33 (2013))).

June 14, 2010) (dismissing a § 1981 claim where the plaintiff's allegations "expressly and exclusively refer[red] to 'national origin'" and her "being from Morocco").

Finally, Defendants argue that the protections of § 1981 are simply inapplicable here, because even if the Plaintiffs were subjected to the conduct that they allege, it did not interfere with their ability to contract. Plaintiffs have alleged that after they completed their session of target practice, they "intended to proceed to [Defendants'] show room" to "shop[] around" and "purchase items," and that they were ultimately prevented from "purchas[ing] items from Defendants' showroom (as they had intended)" when Milowicki removed them from the premises. See Am. Compl. ¶¶ 10, 20. Defendants acknowledge, as they must, that "the version of events proffered by the Plaintiffs" must be assumed to be "true, complete and correct in every respect" and "taken in a light most favorable to the Plaintiffs" at this stage of the proceedings, see Mem. Supp. Mot. Dismiss 16-17, but they nevertheless proceed to devote three pages of their brief (and one lengthy footnote) to telling their side of the story. Under their version of events, by the time Milowicki removed them from the premises, the Plaintiffs had "clearly fully completed each and every transaction they intended to engage in" and had not "giv[en] any indication of any kind that they wished to engage in any further transactions," which means that no § 1981 claim may be had. See Mem. Supp. Mot. Dismiss 9 n.1, 16-18; Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 854 (8th Cir. 2001).

But it is axiomatic that a motion to dismiss pursuant to Rule 12(b)(6) is a vehicle to test the sufficiency of the complaint, not to adjudicate the veracity of the allegations that lie within. See Iqbal, 556 U.S. at 679 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). The inquiry is therefore limited to "the allegations contained in the complaint, exhibits

attached to the complaint and matters of public record." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).[8]

## III.  Conclusion and Order

Accordingly, this 15th day of March, 2016, finding that none of Defendants' contentions justify the dismissal of either of Plaintiffs' claims, the Motion of Defendants Tommy Gun, Inc., d/b/a/ Targetmaster and Thomas Milowicki to Dismiss Plaintiffs' First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), ECF No. 9, is **DENIED**.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

---

[8]     Apart from whether or not Plaintiffs were prevented from purchasing additional items from the showroom, Defendants may have interfered with their contractual rights in another way. They contend that when Milowicki confronted them, they were in the restroom on the premises washing their hands after their session of target practice. Am. Compl. ¶¶ 9-16; Mem. Supp. Mot. Dismiss 15 n.3 ("Plaintiffs aver that it was only after they had purchased merchandise . . . , utilized the gun range, went back to the showroom area, and then went into a lavatory, they were verbally directed to leave the premises."). It is plausible that a customer's purchase of a session at Tommy Gun's firing range carries with it the right to use the restroom on the premises to wash his or her hands after a session of target practice. See Ezell v. City of Chi., 651 F.3d 684, 692, 710 (7th Cir. 2011) ("Sergeant Daniel Bartoli, a former rangemaster for the Chicago Police Department, . . . testified . . . [to] the possible problem of contamination from lead residue left on range users' hands after shooting. . . . He . . . said a range should have running water onsite so users can wash lead residue from their hands after shooting."). If that is so, Milowicki's decision to remove Plaintiffs from the premises while they were attempting to avail themselves of that contractually-acquired benefit may be a separate instance of interference with their rights under § 1981. See Perry v. Burger King Corp., 924 F. Supp. 548, 552 (S.D.N.Y. 1996) (concluding that a restaurant patron who was denied access to the bathroom had "stated a claim under § 1981, particularly if [he was] considered to have contracted for food and use of the bathroom").